UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ERYN M. PEARSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 18-cv-1452-JES-JEH |
| | ) |
| CITY OF PEORIA, JERRY MITCHELL, | ) |
| LISA SNOW, BRADFORD VENSON, | ) |
| AND TODD GREEN, | ) |
| | ) |
| Defendants. | ) |

## ORDER AND OPINION

This matter is now before the Court on a Motion to Dismiss (D. 15[1]) filed by Defendants City of Peoria, Jerry Mitchell, Lisa Snow, Bradford Venson, and Todd Green. Plaintiff Eryn M. Pearson filed a Response (D. 19) and Defendants filed a Reply (D. 24). For the reasons set forth below, Defendants' Motion is DENIED in part and GRANTED in part.

### BACKGROUND

For the purposes of resolving this Motion, the Court takes the following factual allegations from Plaintiff's Complaint as true. In September 2016, Plaintiff Eryn M. Pearson ("Pearson") was hired as a probationary police officer ("recruit") for the Peoria Police Department ("Department"), which is a department within the City of Peoria, Illinois ("Peoria" or "City"). D. 1, at 4. Pearson began training the Peoria Police Department Academy and graduated near the top of her class. *Id.*

Upon graduation from the Academy, Pearson was assigned to the Department's field training program with a group of ten other recruits. *Id.* Defendant Bradford Venson ("Venson")

---

[1] Citations to the Docket in this case are abbreviated as "D. __."

1

was the supervisor of the field training program since at least 2011. *Id.* Venson and unnamed members of the Department divided Pearson's training group into "favored" recruits and "disfavored" recruits based on gender, race, and physical disability. *Id.*

"Favored" recruits were mostly white males. *Id.* at 5. The sole exception was one white female who had strong personal ties with the Department. *Id.* The "favored" recruits were given privileges withheld from the "disfavored" recruits, such as assignments to more affluent and sought-after districts, specialized and private training, and preferential treatment by members of the Department. *Id.*

"Disfavored" recruits consisted of those who were female, non-white, or had physical disabilities. *Id.* The "disfavored" recruits were subjected to harassment and discrimination through verbal abuse, public humiliation, and beratement in front of fellow recruits. *Id.* They were isolated and denied benefits provided to the "favored" recruits. *Id.* Pearson was grouped with the "disfavored" recruits because of her gender. *Id.*

As a "disfavored" recruit, Pearson was denied basic training and essential resources that were provided to the "favored" recruits. *Id.* Pearson suffered from stress and anxiety and received lower marks in evaluations due to the lack of training on essential resources and tools. *Id.* She devoted off-duty time to studying maps in an attempt to memorize addresses because she was not aware of an address location system (the "block divider") available to all officers that allowed them to quickly locate addresses with ease. *Id.* at 6. The block divider is specifically listed on the written schedule for recruit training; however, Pearson was deprived of its benefit until halfway through her training when another officer explained how to use it. *Id.* Defendants purposefully denied essential instruction in early phases of training in order to make the "disfavored" recruits vulnerable to criticism and humiliation. *Id.* at 7. For instance, the

"disfavored" recruits were criticized for their ability to find and promptly arrive at addresses given over the radio. *Id.* They were led to believe it was due to personal incompetency, even though Defendants intentionally omitted instruction on the block divider and did not follow the written training program. *Id.* This was done to prevent female, minorities, and physically disabled recruits from succeeding in their careers as law enforcement officers. *Id.*

Venson continuously berated Pearson in front of other members of the Department and acted as her training officer on a number of shifts to increase his abuse and downgrade Pearson's evaluations. *Id.* at 9-10. Venson stepped in to criticize Pearson if he felt other unnamed training officers were not being harsh enough and reprimanded those training officers who did not downgrade Pearson's evaluations, even when they stated her performance was satisfactory. *Id.*

Pearson alleges other "disfavored" recruits experienced similar treatment due to their gender, race, or physical disability. *Id.* Reggie Smith and Ryan Umberger were recruits at the Department at the same time as Pearson and they were also considered "disfavored." *Id.* at 5. Reggie Smith is African American. *Id.* Ryan Umberger has a medical condition that does not disqualify him from work as a police officer. *Id.*

Pearson also claims the Department had a widespread policy, practice, or custom of frequently subjecting minority citizens to illegal stops without probable cause or reasonable suspicion. *Id.* at 8. Recruits were instructed to coerce minority citizens to consent to searches of their property. *Id.* Pearson refused to engage in this practice of discriminating against minority citizens. *Id.* As a result, Venson's hostile focus on Pearson intensified and the harassment against her increased. *Id.*

Pearson completed the final stage of field training in early September 2017 and was assigned a shift as a solo patrol officer, which was an informal indication the recruit had finished

the training program and had been "accept[ed] onto the force as a permanent member." D. 1, at 10. Sometime before Pearson began the solo patrol assignment, Venson called and instructed her to attend a training meeting instead of reporting for duty as a patrol officer. *Id.* at 11. Pearson attended the training meeting with Defendants Venson, Lisa Snow ("Snow"), and Todd Green ("Green"). *Id.* at 12. They informed Pearson she was being terminated without explanation. *Id.* They told Pearson the termination would prohibit her from any future work in law enforcement, but she could keep her accreditation if she resigned. *Id.* She chose to resign and prepared a resignation letter in Venson's office with him standing over her. *Id.* at 13. The day after submitting her resignation, Pearson sent letter to the Chief of Police, Jerry Mitchell ("Mitchell"), rescinding her resignation and explaining she had been coerced. *Id.* Pearson never received a response from Mitchell. *Id.*

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must describe the claim in sufficient detail to put defendants on notice as to the nature of the claim and its bases, and it must plausibly suggest the plaintiff has a right to relief. *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007). A complaint need not allege specific facts, but it may not rest entirely on conclusory statements or empty recitations of the elements of the cause of action. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding whether the complaint sufficiently states a claim, courts take well-pleaded allegations in the complaint as true and draw all permissible inferences in favor of the plaintiff. *See Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015).

**DISCUSSION**

Defendants now collectively move to dismiss the complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). The Court will first address Count IV; then Counts V and VI, along with Counts I, II, and VII as they pertain to Defendants Peoria and Mitchell in his official capacity; finally, Counts I, II, III, and VII as they pertain to the individual Defendants Venson, Snow, Green, and Mitchell.

**Count IV – Violation of § 2000e-2 Under Title VII Against All Defendants**

As a prerequisite to filing a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq, a charge of discrimination must be filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days after the alleged unlawful employment practice. *Doe v. Oberweis Dairy*, 456 F.3d 704, 708 (7th Cir. 2006). Failure to file an EEOC charge within the statutory period renders the charge untimely and the plaintiff is precluded from bringing an action in federal court. *Id.*

Defendants move to dismiss Count IV because Pearson filed her charge with the EEOC more than 335 days after her termination, instead of within the 300 days required by statute. D. 15, at 2. Defendants submit the statute of limitations period began on September 19, 2017, when Pearson resigned, or in the alternative, on September 21, 2017, when Pearson rescinded her resignation. D. 16, at 5. Defendants argue Pearson had to file a charge with the EEOC by July 16, 2018, but the EEOC received her charge on August 20, 2018. *Id.* at 6. Defendants attach the EEOC's letter to Pearson as an exhibit, which states her file would be closed because the charge was not timely filed. D. 16-2.

In her Response, Pearson submits she was "left in limbo" after sending the letter to rescind her resignation to Mitchell's office. D. 19, at 4. "The board" was supposed to contact her

or refer her case to the EEOC officer "as required by rule 4.17" but it never happened. *Id.* Pearson also claims for the first time she relied on "an EEOC supervisor's calculation in filing her complaint" and "the supervisor's calculations may or may not have been inaccurate[sic]" *Id.* at 5. She does not provide additional details about what the EEOC supervisor said or how it affected her ability to meet the required deadline.[2] Pearson argues the Court should apply either equitable tolling or estoppel to the exhaustion requirement of Title VII, citing cases from the Second and Fourth Circuits in support. *Id.* at 6-7.

The Supreme Court has cautioned that equitable tolling for Title VII claims should be "applied sparingly." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061 (2002)). Equitable tolling allows the statute of limitations to be extended if, despite due diligence, the plaintiff cannot obtain necessary information to understand she may have a claim. *Beamon*, 411 F.3d at 860. A court must consider "whether a reasonable person in the plaintiff's position would have been aware of the *possibility* that he had suffered an adverse employment action because of illegal discrimination." *Id.* at 861 (emphasis in original).

Pearson alleges she was discriminated against in the recruit training program as prohibited under § 2000e-2(d) and then discharged as prohibited by § 2000e-2(a). D. 1, at 19. "For the purposes of this statute of limitations, discrete discriminatory employment actions such as termination … are deemed to have been taken on the date they occurred, even if they form part of an ongoing practice or are connected to other acts." *Beamon*, 411 F.3d at 860. Accordingly, the time period to file an EEOC charge began on the date Pearson was discharged

---

[2] Pearson submits an affidavit (D. 20) with her response to the instant motion. For the Court to consider this document, it must convert the motion to dismiss to a motion for summary judgment. Fed. R. Civ. P. 12(d); *Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000). The Court assumes Pearson does not wish for this motion to be converted to one for summary judgment, thus, the affidavit will not be considered.

because she was then aware of a possible adverse employment action due to gender discrimination. Still, any attempt to calculate the statute of limitations is somewhat hindered because Pearson's discharge date is not in her initial pleading.

The Complaint does not state Pearson's discharge date; however, it states she sent a letter the following day to Mitchell and it was received by certified mail on September 21, 2017. D. 1, at 13. Defendants submitted Pearson's Charge of Discrimination as an exhibit[3], on which she listed September 21, 2017 as the latest occurrence of discrimination. D. 16-1, at 1. While Pearson was likely discharged days before, the Court will use September 21, 2017 to calculate the period in which she had to file an EEOC charge. To meet the 300-day filing deadline, Pearson had to file on or before July 18, 2018. The Charge of Discrimination was marked by the EEOC as received on August 20, 2018. D. 16-1, at 2. Because Pearson filed a charge of discrimination 33 days after what is allowed by statute and for the reasons set forth above, the motion to dismiss Count IV is GRANTED with prejudice.

**Counts V & VI – Claims Against Peoria; Counts I, II, & VII – Claims Against Peoria and Mitchell In His Official Capacity**

Pearson brings a *Monell* claim (Count V) and a state law claim for indemnification (Count VI[4]) against Defendant Peoria. Additionally, Pearson alleges the unlawful conduct giving rise to Counts I, II, and VII was due to a widespread practice, policy, or custom.

Under the *Monell* claim, Pearson states, "the misconduct inflicted upon Plaintiff was a result of the policy, practice, and custom of [Peoria]" and was so pervasive and widespread it

---

[3] On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), documents presented outside the pleadings are generally either excluded or the motion is converted to a motion for summary judgment; however, documents attached to a motion to dismiss may be considered part of the pleadings if they are referred to in the Complaint and are central to the claim. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).
[4] The Complaint misnumbers the claims for state law indemnification and § 1983 retaliation as Counts V and IV respectively. The Court will follow the sequence of the preceding counts and refer to these claims as Counts VI and VII.

constituted the *de facto* policy. D. 1, at 20. She asserts policymakers knew or should have known of "the unconstitutional policy" and were deliberately indifferent. *Id.* Pearson does not provide additional details about the policy that is the basis of her *Monell* claim.

Defendants move to dismiss Count V because Pearson did not allege facts that would permit a reasonable inference of an allegedly unconstitutional practice so widespread it created a *de facto* policy or practice. D. 15, at 3. Defendants contend Pearson has not supported her *Monell* claim that Peoria has a *de facto* policy of discriminating against "disfavored" recruits and coercing their resignation. *Id.* at 16. Defendants also move to strike all statements throughout the Complaint alleging a "widespread practice, policy, or custom" and of "final policymakers." D. 16, at 17.

Pearson's response to the instant motion provides more detail on the unconstitutional policy alleged as the basis of her *Monell* claim. Pearson asserts she "has sufficiently pled that Defendants' widespread policy of violating minority citizens' rights from both her on[*sic*] observations and observations of her fellow officers[.]" D. 19, at 16.

*Monell* held § 1983 actions could not be brought against local governments under a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A municipality like Peoria can only be held liable under § 1983 when the plaintiff identifies a practice, policy, or custom "that effectively caused or condoned the alleged constitutional violations." *Barnes v. City of Centralia*, 943.F.3d 826, 832 (7th Cir. 2019) (quoting *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)). Put another way, a municipal employee must inflict a constitutional injury on the plaintiff by executing a municipal policy or custom. *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014). Pearson does not identify how her constitutional rights were violated by Peoria's alleged *de facto* policy of discriminating against

minorities; however, the Court makes the reasonable inference she is referring to a due process violation because of her argument against dismissal of this Count and the Complaint alleges that she was discharged in part because of her refusal to discriminate against minority citizens.

While a complaint need not allege specific facts, it may not rest entirely on conclusory statements or empty recitations of the elements of the cause of action. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Iqbal*, 556 U.S. at 678. Looking to the Complaint for a factual basis to support this *Monell* claim, Pearson says the harassment against her increased after she refused to "engage in this pattern and practice of discrimination" and Venson's "hostile focus on Plaintiff intensified[.]" D. 1, at 8. She says there were at least two other recruits who refused to discriminate against minority citizens and, as a result, were "subjected to harassment and eventually forced out" of the Department. *Id.* at 9. Pearson also claims she complained to Mitchell in her letter that her resignation was coerced, though she does not say whether she informed Mitchell that she believed it was due to her refusal to discriminate. *Id.* at 13.

Pearson maintains these allegations are sufficient to state a *Monell* claim against Peoria. The Court disagrees. In order to state a facially plausible *Monell* claim, the factual allegations in Pearson's Complaint must allow us to draw the reasonable inference that Peoria policymakers knew of and were deliberately indifferent to recruits being intentionally discharged because they refused to discriminate against minority citizens. That is, Pearson needed to allege enough "by way of factual content to 'nudg[e]' [her] claim 'across the line from conceivable to plausible.'" *Iqbal*, 129 S. Ct. at 1952 (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955). The only policymaker identified in the Complaint is Mitchell and Pearson does not allege Mitchell knew recruits were being discharged for their refusal to discriminate or that any other recruit had complained about being forced to resign. Pearson is granted leave to amend this claim to cure its

9

deficiencies, but currently, she has not provided the factual basis to nudge her *Monell* claim under Count V across the line from conceivable to plausible.

The same can be said for Pearson's allegations that a widespread practice, policy, or custom existed to discriminate against recruits based on gender (Counts I), to violate recruits' right to due process (Count II), or to retaliate against recruits (Count VII). Pearson has not provided a factual basis that municipal policymakers, including Mitchell, knew of and were deliberately indifferent to a widespread policy, practice, or custom related to any of these causes of action.

In describing Venson's role as the supervisor of the field training program, Pearson alleges Peoria knew he was discriminating against recruits who were female, non-white, or physically disabled. D. 1, at 4. Pearson goes on to say the City was responsible for retaining Venson in this supervisory role and as such, Peoria ratified and adopted Venson's pattern or practice of discrimination. *Id.* Pearson discussed two male recruits, one who is African American and one who has a medical condition, that were in the field training program with her and were also harassed by Venson. *Id.* at 6-7. This is in direct contrast to Peoria's stated interest in hiring more diverse police officers. *Id.* at 16. As discussed above for the *Monell* claim, Pearson does not provide a factual basis to establish policymakers knew of Venson's conduct or that it was so widespread and persistent that it constituted a *de facto* policy. The Seventh Circuit has refused to adopt a bright-line rule defining "widespread custom or practice," but it has rejected claims of a widespread custom or practice involving a single incident, or three incidents. *Bridges v. Dart*, 950 F.3d 476, 479 (7th Cir. 2020). "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Id.* (quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006)).

It is also important to note that Pearson is suing Jerry Mitchell, the former Chief of the Peoria Police Department, "in both his individual and official capacity as the official policymaker of the City of Peoria when it comes to direct oversight of the Peoria Police Department." D. 1, at 3. "An official capacity suit . . . is a way of pleading an action against an entity of which the named defendant is an agent, but where the real party in interest is the entity." *Jones v. Town of Highland*, 2014 U.S. Dist. LEXIS 122463, *8-9, 2014 WL 4376543 (N.D. Ind. 2014) (internal quotations omitted). As such, it is redundant to bring the same claims against Mitchell in his official capacity and against Peoria. To the extent Counts I, II, and VII allege the existence of a widespread practice, policy, or custom, the discussion pertaining to claims against Peoria is applicable to Mitchell in his official capacity.

Finally, Pearson brings a state law claim for indemnification against Peoria under Count VI. D. 1, at 20-21. Pearson properly pled individual Defendants were Peoria employees acting within the scope of their employment. Defendants did not move to dismiss this Count, but they note it would fail if no substantive claims survive the motion to dismiss. Because some claims survive and it is too early to know whether Peoria must indemnify the individual Defendants, Count VI survives.

For these reasons, the motion to dismiss is GRANTED as to Count V against Peoria, though Pearson is granted leave to amend. For Counts I, II, and VII, the motion to dismiss is GRANTED against Defendants Peoria and Mitchell in his official capacity.

**Count I – Gender-Based Discrimination Under § 1983 Against All Individual Defendants**

Defendants move to dismiss Count I because it does not sufficiently state a claim according to the standards of *Iqbal*, 556 U.S. 662 (2009), and *Twombly*, 550 U.S. 544 (2007). D.

15, at 3. Defendants argue Pearson does not support her claim with factual allegations, but "merely alleges in a vague and conclusory fashion that she was subjected to discrimination" before pointing to two male recruits who were treated similarly. *Id.*

While a complaint must contain more than a general recitation of the elements for a cause of action, a complaint alleging gender discrimination under § 1983 need only claim that a state actor intentionally discriminated against her because of her gender. *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) ("I was turned down for a job because of my race" is all a complaint need state for a claim of racial discrimination under Title VII or equal protection claim under Fourteenth Amendment); *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 781-82 (7th Cir. 2007) (affirming minimal pleading standard for simple claims of racial or sex discrimination post-*Twombly*).

Here, Pearson alleges she was harassed, denied essential instruction, and eventually forced to resign because of her gender. Pearson claims Venson and other unknown members of the Department divided her training class into "favored" recruits, who were mostly white males, and "disfavored" recruits, who were female, non-white, or physically disabled. Pearson describes continuous harassment by Venson, including directing unnamed training officers to give harsher criticism and downgrade Pearson's evaluations. Finally, Venson instructed Pearson to attend the training meeting, which resulted in her resignation, and he stood over Pearson as she typed her resignation letter in his office. While Pearson pleads more than enough to connect Venson to a gender discrimination claim, her allegations against the remaining individual Defendants are thin.

Defendants Snow and Green are not mentioned in the Complaint until Pearson is nearing the end of the field training program. Since Pearson alleged Snow and Green were involved in

her coerced resignation, which was in part because of gender discrimination, the claim survives against these Defendants at this stage in the litigation. The motion to dismiss is DENIED as to Count I against Venson, Snow, and Green.

Pearson does not allege Mitchell was personally involved in her discharge, only that he received and never responded to the letter after her resignation. A supervisor may only be held liable for the deprivation of a constitutional right if it has been shown that the supervisor was personally responsible for the deprivation. *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). A plaintiff can show the supervisor's personal involvement by establishing the supervisor knew of the conduct and facilitated, approved, condoned, or turned a blind eye to it. *Id.* Pearson says does not allege that she ever complained to Mitchell about being harassed or fired because of her gender. If Pearson wishes to amend this claim to allege Mitchell discriminated against her because of her gender, she is granted leave to do so; however, the Motion to Dismiss is GRANTED as to Count I against Mitchell.

**Count II – Violation of Procedural Due Process Under § 1983 Against All Individual Defendants**

Defendants move to dismiss Count II because Pearson had no property interest in her employment. D. 15, at 2. Defendants contend Pearson has alleged a probationary, at-will employment relationship, which does not entitle her to due process protections. D. 16, at 7.

Pearson claims her procedural due process rights were violated because she was not given a proper termination hearing in violation of Department rules and guidelines. D. 1, at 17. Specifically, Pearson alleges Defendants violated Field Training General Order 300.11 ("FTGO 300.11"), which sets out a procedure for terminating a recruit who is "not performing at a satisfactory level[.]" *Id.* at 14. FTGO 300.11 states that once a recruit is recommended for

13

termination, the training commander shall prepare a detailed report, which is reviewed by the police chief. *Id.* Then the recruit is notified, and a termination hearing must be set within 72 hours. *Id.* The police chief presides over the hearing, during which the chief and training commander present reasons for the termination and the recruit is given an opportunity to respond. *Id.*

To state a due process claim, Pearson must establish she had a constitutionally protected property interest in her employment with the Department. *Covell v. Menkis*, 595 F.3d 673, 675 (7th Cir. 2010). "Under Illinois law, a person has a property interest in his job only where he has a legitimate expectation of continued employment based on a legitimate claim of entitlement." *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007). Pearson can show a legitimate expectation of continued employment by pointing to an Illinois law, an ordinance, a contract, or some understanding that limits the Department's ability to discharge her. *Redd v. Nolan*, 663 F.3d 287, 296 (7th Cir. 2011). While Illinois generally does not recognize a property interest in continued employment for probationary public employees, a municipality may provide greater protection to these employees through enacting rules and regulations. *Redd*, 663 F.3d at 296. Such a rule or regulation can only create a property interest if it is a "clear policy statement" that overcomes the clear statutory language allowing probationary employees to be fired without cause. *Id.* at 296-97. In other words, Pearson needs to point to something that declares recruits can *only* be terminated from the Department for cause.

Pearson argues probationary officers in Peoria are given greater due process protection than provided by state law. D. 19, at 8.[5] She contends FTGO 300.11 created an entitlement to a

---

[5] Pearson also argues her property interest vested when she was assigned a solo patrol shift because it meant she was no longer a probationary officer. D. 19, at 7-8. Pearson does not cite any authority supporting this argument. Additionally, Pearson claims a solo patrol shift was an informal indication a recruit had completed training and become a permanent member of the Department. As such, the Court finds it is unnecessary to further address this

property interest and that entitlement is "strengthened by other agreements, policies, and aspects of the recruit program." *Id.* Pearson refers to Rule 4.17 of the Board of Fire and Police Commissioners' Rules and Regulations, which "creates rights to either a quasi-judicial requires[*sic*] hearing by the board or an investigation by the Defendants' EEOC officer." *Id.* Pearson also refers to "extensive written provisions" that created a property interest, including "signed agreements," "department rules and orders," and "a written multi-step procedure with specific promises of notice, review, and two hearings[.]" There is no further detail about those provisions.

It is questionable whether FTGO 300.11 or any other provision establishes Pearson had a protected property interest in her employment because she does not allege recruits could be terminated only for cause. "Procedural guarantees, whether relied on or not, do not establish a property interest protected under the Fourteenth Amendment's Due Process Clause." *Rujawitz v. Martin*, 561 F.3d 685, 688 (7th Cir. 2009). Even an agreement or signed document stating recruits can be fired for cause does not establish a protected property interest. *Redd*, 663 F.3d at 296-97 (finding a signed agreement that states "I am on probation and can be terminated for cause" was not a sufficient clear policy statement that probationary employees could only be terminated for cause). However, Pearson does assert Defendants were limited in their ability to discharge recruits. For purposes of a 12(b)(6) motion, the Court will allow this matter to go forward, with the belief that discovery and possibly dispositive motions may resolve the issue. For these reasons, the motion to dismiss is DENIED as to Count II.

**Count III – Conspiracy Under § 1983 Against All Individual Defendants**

Defendants move to dismiss Count III because it fails the *Iqbal* plausibility test. D. 15, at

---

argument.

3. They point to the absence of facts identifying individuals involved in the conspiracy, any meeting or understanding between those individuals, the scope or purpose of any such meeting or understanding, or the date or location of the meeting. *Id.*

Even before *Twombly*, 550 U.S. 544, and *Iqbal*, 129 S. Ct. 1937, a bare allegation of a conspiracy could not survive a motion to dismiss. *Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009). The Supreme Court established the plausibility standard in *Twombly* for complex litigation and then extended its application to litigation in general with *Iqbal*. *Id.* at 971. To determine whether a plaintiff has stated a plausible claim for relief, a reviewing court must look at the context of the claims and draw on its judicial experience and common sense. *Id.* The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To plead a plausible § 1983 conspiracy claim, it is sufficient to "indicate the parties, general purpose, and approximate date." *Walker v. Thompson*, 288 F.3d 1005, 1007-08 (7th Cir. 2002) (stating that conspiracy actions should not be dismissed because they are "conclusory" or because they fail to specify an overt act). Pearson has not met this burden.

Pearson brings this Count against all individual Defendants. She alleges Defendants Snow, Green, and Venson, along with unknown members of the Department, conspired to either terminate her employment or force her to resign and attempted to justify their actions "by dubious means." D. 1, at 18. Unknown members of the conspiracy acted in furtherance of it by inserting fabricated evaluation reports into Pearson's file. *Id.* Pearson claims that by conducting termination meetings under the guise of training meetings, Defendants sought to "rid themselves of diverse recruits and recruits that refused to violate the rights of minority citizens." D. 1, at 14.

Pearson has alleged a general purpose, but that is all she offers to support this conspiracy

16

claim. She has not indicated all the parties to the conspiracy, but instead alleges unknown members of the Department were involved. She has not pled an approximate date, so it is unknown when the plot began. Pearson does not come close to stating a facially plausible claim that these Defendants conspired to terminate recruits who were female, non-white, or physically disabled or those who refused to discriminate. While Pearson claims other recruits were terminated or forced out for those reasons, she does not connect these Defendants to the removal of any other recruit. This claim also conflicts with Pearson's bare allegations throughout the complaint that a widespread policy, practice, or custom existed with the same purpose as the conspiracy. In short, Pearson does not provide a factual basis to raise this conspiracy claim above a speculative level.

In her response to the motion, Pearson contends she has pled a persistent pattern of harassment by training supervisors and other officers that culminated in her coerced resignation. D. 19, at 14. Pearson claims she has alleged a scenario in which "harassment is obviously the product of a conspiracy[]" and the daily harassment by Defendants' employees showed a "unified effort to make Plaintiff's workday unbearable." *Id.* at 15.

Despite her arguments to the contrary, Pearson has not alleged a persistent pattern of harassment by anyone other than Venson. Pearson does not name the training officers who fabricated negative evaluation reports, though she does allege Venson ordered training officers to downgrade her evaluations. There is no allegation that Snow, Green, or Mitchell had any involvement in field training program, that they were involved in harassing Pearson, or that they even knew Pearson was being harassed. Moreover, Green contacted Pearson's father, who had previously worked in local law enforcement, and told him that he should be proud of his daughter's accomplishments after she was assigned a solo patrol shift. D. 1, at 11. This action

17

hardly seems like that of a co-conspirator who sought to harass and remove from the Department any recruit who was not a white male or who refused to discriminate against minorities.

Pearson is far from alleging a plausible conspiracy claim under § 1983. As such, the motion to dismiss is GRANTED as to Count III with leave to amend.

**Count VII[6] – Retaliation Under § 1983 Against All Individual Defendants**

Defendants move to dismiss Count VII because Pearson has not identified the specific constitutional provision that was violated and as a result, she cannot make a prima facie case under § 1983. D. 16, at 8. They argue Pearson cannot allege a violation of the Fourteenth Amendment under this claim because "Pearson had no property interest in her job and therefore has no due process claim." *Id.* at 9. Defendants argue the only possible constitutional provision applicable to Pearson's retaliation claim is her right to free speech under the First Amendment. *Id.*

Pearson argues the Complaint satisfies the pleading standard for a retaliatory discharge count and then cites the elements for retaliatory discharge under Illinois law. D. 19, at 11-12. Pearson states she questioned her supervisors' instructions "to subject minority citizens to illegal stops without probable cause or reasonable suspicion and to conduct illegal searches in violation of the 4th[*sic*] Amendment." *Id.* at 12. She then focuses on the circumstances surrounding her discharge and how she was not provided a termination hearing. *Id.* at 12-13. Pearson does not respond to Defendants' argument that the First Amendment is the only applicable constitutional provision to this claim.

Plaintiffs are not allowed to amend their complaints through the briefs in opposition to a motion to dismiss. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,

---

[6] See Footnote 4.

18

631 F.3d 436, 448 (7th Cir. 2011) (it is "an axiomatic rule that a plaintiff may not amend his complaint in his response brief"). As such, the Court will disregard Pearson's references to the elements for retaliatory discharge under Illinois law as this is a federal claim for retaliation under § 1983. If Pearson wishes to add a state law claim for retaliatory discharge, she must request leave to amend her Complaint to do so.

As stated above under Count II, the Court is allowing Pearson's due process claim to proceed at this stage in the litigation. Since Defendants make no further argument on Pearson's retaliation claim under § 1983 by way of a due process violation, the motion to dismiss is DENIED as to Count VII.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss (D. 15) is DENIED in part and GRANTED in part. For the sake of clarity, the Court will summarize its Order:

- Count I is dismissed against Defendants Peoria and Mitchell; it remains against Defendants Venson, Snow, and Green.
- Count II is dismissed against Defendants Peoria and Mitchell in his official capacity; it remains against Defendants Venson, Snow, Green, and Mitchell in his individual capacity.
- Count III is dismissed against all individual Defendants without prejudice.
- Count IV is dismissed with prejudice.
- Count V is dismissed against Defendant Peoria without prejudice.
- Count VI remains against Defendant Peoria.
- Count VII is dismissed against Defendants Peoria and Mitchell in his official capacity; it remains against Defendants Venson, Snow, Green, and Mitchell in his individual capacity.

Plaintiff Pearson is granted leave to amend any of the claims dismissed without prejudice by filing a first amended complaint on or before April 30, 2020.

Signed on this 9th day of April, 2020.

s/James E. Shadid  
James E. Shadid  
United States District Judge
