## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ERYN M. PEARSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-1452-JES-JEH |
| | ) | |
| CITY OF PEORIA, ILLINOIS *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER AND OPINION

This matter is now before the Court on Defendants' Motion (Doc. 40) for Summary

Judgment. Plaintiff has filed a Response (Doc. 43) and Defendants have filed a Reply (Doc. 46).

For the reasons set forth below, Defendants' Motion is granted.

### BACKGROUND

This case involves a female Peoria Police Department recruit who, like at least one male

recruit in her class, was terminated by the Department prior to the end of her one-year

probationary period as a recruit. The Department maintains that it terminated her for failure to

pass the five phases of her field training program, which included documented performance

deficiencies from various officers. Although other females in her class successfully passed their

training, Plaintiff claims she was singled-out and terminated due to her gender.

#### A. Procedural Background

After being terminated in September 2017, Plaintiff Eryn M. Pearson filed a seven-count

Complaint on December 24, 2018, against Defendants City of Peoria, Illinois; former Chief Jerry

Mitchell; former Assistant Chief Lisa Snow; Patrol Captain Todd Green; former Field Training

Supervisor, Sergeant Bradford Venzon; and unknown Defendants. Doc. 1, at 1. She alleged that

Defendants unlawfully and purposefully discriminated against Plaintiff, willfully violated her constitutional, statutory, and other rights while employing abuse, deception, and coercion, due her gender and her refusal to discriminate against Peoria's minority citizens. *Id*. Plaintiff has since dropped her theory and factual assertions that she was retaliated against for refusing to discriminate against minority citizens, but her gender discrimination theories remain.

On June 27, 2019, Defendants filed a motion to dismiss for failure to state a claim. *See* Docs. 15; 16. Plaintiff filed a response to Defendants' motion on October 23, 2019. On April 9, 2020, the Court granted in part and denied in part Defendants' motion to dismiss. Doc. 25. The Court dismissed Plaintiff's Section 1983 conspiracy claim against all individual Defendants (Count III) for failure to state a plausible claim; dismissed Plaintiff's *Monell* claim (Count V) against Peoria; dismissed Plaintiff's Title VII claim (Count IV) against all Defendants as untimely; and dismissed Plaintiff's Section 1983 claim (Counts I, II, and VII) only as to Defendants City of Peoria and Chief Mitchell in his official capacity for *Monell* liability. Doc. 25.[1] Plaintiff was given an opportunity to file an amended complaint for various Counts but chose not to do so. Thus, the remaining claims are the Section 1983 equal protection claim (Count I) against Defendants Venzon, Snow, and Green; the procedural due process claims (Counts II and VII) against Defendants Venzon, Snow, Green, and Mitchell in their individual capacities; and the state law indemnification claim (Count VI) against the City of Peoria.

---

[1] As stated in the Court's previous Order (Doc. 25), the Complaint misnumbers the claims for state law indemnification and § 1983 retaliation as Counts V and IV respectively. To prevent confusion, the Court follows the numeric sequence of the preceding counts and refer to these claims as Counts VI and VII.

### B. Summary Judgment Briefing

Plaintiff's brief is rife with blatant disregard for the Local Rules of the Central District of Illinois and well-known standards applied in summary judgment briefing. As the Court has informed parties in previous cases,

> While strict, the requirements imposed on the parties by Rule 56 and Local Rule 7.1(D) are not meant to be punitive. "Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own." *Waldridge*, 24 F.3d at 923 . . . Because summary judgment is such a drastic remedy, the Court regularly informs the parties when they fail to adhere to these strict requirements, and exercises its discretion to decide whether to apply the rule strictly or to overlook any transgression. *Id.*

*McMahon v. Dunlap Cmty. Unit Sch. Dist. No. 323*, 274 F. Supp. 3d 836, 842–43 (C.D. Ill. 2017); *see also Lugg v. Sutton et al.*, No. 18-CV-1412-JES-JEH, 2021 WL 3673824, at *2 (C.D. Ill. Aug. 18, 2021). As relevant to Plaintiff's failures here, Local Rule 7.1(D)(2)(b) provides that a response to a summary judgment motion must state, in separate subsections: undisputed material facts, disputed material facts, disputed immaterial facts, undisputed immaterial facts, and additional material facts. With regard to the undisputed material facts section, the plaintiff is instructed to "[l]ist *by number* each fact from Section B of the motion for summary judgment which is conceded to be undisputed and material." CDIL-LR (D)(2)(b)(1) (emphasis added). Local Rule 7.1(D)(2)(b)(6) cautions, "[a] failure to respond to any numbered fact will be deemed an admission of the fact." *Id.* Likewise, Fed. R. Civ. P. 56(e)(2) provides that when a party fails to properly address another party's assertion of fact as required by Rule 56(c), the court may, *inter alia*, "consider the fact undisputed for the purposes of the motion."

Here, Plaintiff's Response to Defendants' Motion for Summary Judgment failed to respond to any of Defendants' statements of material fact to note, by number, whether such facts were undisputed or disputed and material or immaterial. Instead, Plaintiff chose to re-write all of her own "undisputed material facts" how she saw fit and to intermittently cite to pages in Defendants' brief for support. A summary judgment brief is not evidence, it is the Parties' argument which cites to evidence in support. *Cf.* Fed. R. Civ. P. 56(c)(1)(A) (identifying examples of materials in the record to include depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, and interrogatory answers); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials *in the record*") (emphasis added). Plaintiff did not even cite to the particular paragraph of Defendants' statement of material facts to which she was referring. To the extent it is difficult to ascertain what evidence Plaintiff is trying to refer to, the Court disregards those facts because they do not point to affidavits, depositions, or other evidence of an admissible sort. *See* Fed. R. Civ. P. 56(e)(2); CDIL-LR 7.1(D)(2)(b)(5) ("Each additional fact [in a summary judgment response] must be supported by *evidentiary* documentation referenced by specific page.").

### 1. Defendants' Statement of Undisputed Material Facts

As indicated above, Plaintiff failed to properly respond to Defendants' statement of undisputed material facts, therefore, unless otherwise noted, the following facts are undisputed. *See* CDIL-LR 7.1(D)(2)(b)(6); Fed. R. Civ. P. 56(e)(2).

*Peoria Police Department Recruits and the Nature of their Employment*

On September 19, 2016, Plaintiff was hired by Peoria Police Department ("the Department") as a probationary police officer or "recruit." Doc. 40, SOF ¶ 1.[2] Upon being hired, Plaintiff went through an initial orientation with Human Resources then attended the police academy at the Police Training Institute from September 25, 2016 to December 15, 2016 where she received 12 weeks of basic training. SOF ¶ 7. Each newly appointed police officer is regarded as a probationary employee during the first year of his or her employment by the City of Peoria plus one day for each of formalized training excluding the Field Training Program ("FTP"). SOF ¶ 8. After completing the academy, Plaintiff's probationary period started on December 15, 2016, with an expected end date on December 15, 2017. SOF ¶ 9.

During the probationary period, recruits are "at-will" employees. SOF ¶ 10. The Chief of Police does not need cause to separate a probationary officer from employment. *Id.* (citing Ex. J, Mitchell Dep., pp. 90-91; Ex. M, Collective Bargaining Agreement, § 18.7 – "The retention of the probationary officer is at the discretion of the City and his dismissal shall not be subject to the grievance procedure."; Ex. O, Sec. 2-176 and 2-178 of the Peoria City Code). They can be terminated with or without cause at any time during the probationary period. SOF ¶ 135.

*Field Training Program and Expectations*

After completing the police academy, Plaintiff started the FTP at the Department consisting of an orientation then five phases of field training and evaluation. SOF ¶¶ 15-16 (citing Ex. F, Venzon Dep., p. 20; Ex. C, General Order 300.11, p. 3-4)). The FTP can be completed in as little as 16 weeks, which would entail four weeks for each of the three phases,

---

[2] Unless otherwise indicated, the Court takes the undisputed facts from Defendants' Motion at Doc. 40, which are cited as SOF ¶ ___. Where the Court minimally cites to Plaintiff's SOFs from Doc. 53 throughout this Opinion, they are cited as Pltfs. SOF ¶ ___.

two weeks of shadows at minimum, a week in a traffic unit, and a week encompassing two days in the crime lab, two days in the technology bureau, and a day with the communications center. SOF ¶ 22. Successful completion of field training is required for all sworn personnel. SOF ¶ 44. During each phase, each recruit is assigned a different field training officer ("FTO") who is responsible for training, evaluation, and supervision of the recruit. SOF ¶¶ 23, 41. They use daily, weekly, mid-phase and end-of-phase forms and reports as guidelines to detail their observations and evaluations. SOF ¶ 27 (Ex. A, Pearson Dep., p. 148; Ex. C, General Order 300.11, p. 5). An officer must complete a training program to become an FTO, which includes learning the standards for recruits, how to teach those standards, and how to evaluate recruits, including training on how to apply the performance area ratings. SOF ¶ 24 (citing Ex. F, Venzon Dep., p. 26; Ex. H, Green Dep., p. 12-14; Ex. I, Snow Dep., p. 30-31; Ex. J, Mitchell Dep., p. 14; Ex. C, General Order 300.11, p. 2; Ex. K, Blair Dep., p. 57; Ex. D, Peoria Field Training and Evaluation Program, Def. (Pearson) 3258-3320)). During Plaintiff's time as a recruit, the FTOs reported to Sergeant Brad Venzon, who was the Field Training Sergeant. SOF ¶ 2. Venzon reported to the Field Training Lieutenant, who reported to the Administrative Services Captain, Todd Green, and then the Assistant Police Chief, Lisa Snow, and then Police Chief, Jerry Mitchell. SOF ¶ 3-6.

During the first three phases of the FTP, the recruit is responsible for completing different percentages of the workload prior to advancing to the next training phase: at least 25% of the workload in Phase I; at least 55% of the workload in Phase II, and at least 95% of the workload in Phase III. SOF ¶¶ 16-18. Phase III is a field training and evaluation period with an emphasis on reviewing the essential skills and knowledge required of a competent police officer, as well as corresponding classroom instruction. *Id*. Phase IV is known as "shadow phase"

wherein the FTO is in plain clothes and the recruit is in uniform, then the FTO "shadows" the recruit in the same patrol unit. SOF ¶ 19. In this role, the FTO serves solely as an evaluator of the recruit's performance. *Id*. At this time, training is supposed to be over such that the recruit either meets or does not meet standards. SOF ¶ 43. The recruit is responsible for 100% of the police functions, should not be making any serious fundamental mistakes, and it expected to be proficient in 11 performance areas. SOF ¶¶ 19-20, 44. Upon successful completion of this phase, the recruit is certified for Phase V, the solo patrol assignment, which spans the balance of the probationary employment period. SOF ¶ 19, 21.

As set forth by General Order 300.11, recruits are evaluated in each phase on 11 objective performance areas: (1) electronic communication skills; (2) motor vehicle operation; (3) orientation skill/jurisdictional geography; (4) written communication; (5) field performance; (6) criminal law/ordinances; (7) departmental policies/procedures; (8) self-initiated field activities; (9) traffic/law enforcement; (10) attitude toward police work/dependability/relationships; and (11) attire/dress/equipment. SOF ¶ 28 (citing Ex. F. Venzon Dep., p. 21, 23, 28; Ex. K, Blair Dep., p. 56-57). Each phase also includes written tests to test the recruit's knowledge in areas of radio, electronic communications, geography, criminal law, and traffic law. SOF ¶ 29. Every recruit who has successfully completed the FTP and was hired had satisfactory performance standards in all 11 areas at the end of shadow phase. SOF ¶ 45. The performance area ratings given by FTOs are: (a) S, meets performance standards; (b) B/R, below performance standards but responding to training; (c) B/F, below performance standards and failure to respond to training; and (d) NR, no rating. SOF ¶ 25. A B/R rating is common for recruits in Phase I, but it is anticipated that progress would be shown in Phases II and III, with the acknowledgement that recruits are responsible for more work. SOF ¶ 26. The FTO relies on

performance standards to evaluate recruits and learns the standards so that they grade recruits based on what they observe on the job and compare it to the acceptable standard. SOF ¶ 31.

Geography is a critical skill, along with an understanding of Peoria's 100-block divider system, so that a police officer is able to get where the officer is needed and arrive at a call. SOF ¶¶ 33-34. Recruits are provided a study guide to learn the block dividers, including maps and a list of the hundred blocks, prior to starting the FTP, and the geography examination is essentially the study guide without the answers. SOF ¶ 37. Plaintiff received this study guide at the beginning of field training, she created her own study guide, and received and used maps that she could use as resources. SOF ¶ 49. To meet the performance standard for orientation and geography, the recruit must: (1) demonstrate knowledge of major streets and intersections, locations, landmarks, block numbering, sequence, and patrol district and sector boundaries; (2) utilize street directories and maps without FTO prompting to determine locations and destinations; (3) remember location from previous visits and does not need the district map to get there; (4) is aware of and utilizes shortcuts; (5) arrive within a reasonable time; (6) be able to relay and articulate the officer's location; (7) not rely on FTO/electronic communications to find call location, and (8) not compromise public or officer safety by a lengthy call response. SOF ¶ 32. Field performance includes how the recruit handles call for service, how the recruit talks to people, controls the situation, handles the safety of themselves and others, and handles stress. SOF ¶ 40. Although Venzon considers all performance areas important, he believes the most important area is field performance. SOF ¶ 39.

***Plaintiff's Field Training and Performance***

At the start of her field training, Plaintiff received a training checklist that provided an orientation for the training topics to be covered during field training. SOF ¶ 46. Thereafter, she

received training on specific topics and took written tests during field training. The block dividers were emphasized early on and were a tool to navigate the city and necessary to perform the job and complete the FTP. SOF ¶ 50. She had difficulty executing her knowledge of the block dividers and was told not to rely on the computer navigation system in squad cars in case the computer system went down. SOF ¶¶ 52-53. Plaintiff did not disagree with that rationale. *Id*.

Plaintiff was evaluated by FTOs during each phase of her FTP. In Phase 1, FTO Aaron McBride evaluated her as below standard but responding to training (B/R) in electronic communication skills, motor vehicle operation, orientation skills, geography, and traffic law enforcement. SOF ¶ 55. Plaintiff read, understood, initialed, and signed McBride's evaluation and did not disagree with it or dispute it. SOF ¶ 56. In Phase 2A, FTO John Irving evaluated her as below standards but responding to training (B/R) in geography and field performance. SOF ¶ 57. Plaintiff read, understood, initialed, and signed Irving's evaluation, and did not wish to discuss it with the training sergeant. SOF ¶ 58. Plaintiff did not disagree with Irving's evaluation but just felt that she needed additional training. SOF ¶ 59. Venzon extended Plaintiff's Phase II field training with FTO Jennifer Metcalf for an additional two weeks due to deficiencies in field performance and geography and provided her with a remedial training plan to help improve her performance. SOF ¶ 60. Plaintiff received a mid-phase evaluation in Phase II(A) from FTO Jennifer Metcalf, who evaluated her as below standards but responding to training in motor vehicle operation, geography, and field performance. SOF ¶ 61. Plaintiff read, understood, initialed, and signed Metcalf's evaluation, and did not wish to discuss it with the training sergeant. SOF ¶ 62. Plaintiff received an end of phase evaluation for Phase II with FTO Elizabeth Blair, who evaluated her as below standards but responding to training in field

performance but otherwise meeting standards. SOF ¶ 63. Plaintiff read, understood, initialed, and signed Blair's evaluation and did not dispute it or wish to discuss it with the sergeant. SOF ¶ 64.

Plaintiff's Phase III FTO was Justin Mitchell. SOF ¶ 65. She received a mid-phase evaluation from Mitchell and was rated below standards but responding to training in motor vehicle operation, orientation/geography, and field performance. *Id*. Plaintiff read, understood, initialed, and signed Mitchell's evaluation and did not wish to discuss it with the training sergeant. SOF ¶ 66. Although Plaintiff testified that she did not believe Mitchell's evaluation was accurate at that time because she felt he did not provide direction or instruction, she agreed that she was having trouble with geography and did not disagree with that portion of his evaluation. SOF ¶ 67. Plaintiff's Phase III(B) FTO was Michael Bischoff who gave her both satisfactory and unsatisfactory ratings, which she did not disagree with, although she believed she improved at the end of Phase III. SOF ¶ 68.

During Plaintiff's shadow phase, her assigned FTO was Aaron McDowell. SOF ¶ 69. Plaintiff met with Venzon and McDowell on August 23, 2017, August 29, 2017, and August 31, 2017, to discuss McDowell's below standards evaluation of Plaintiff's performance during the shadow phase. SOF ¶ 70. McDowell did not recommend that Plaintiff move on to solo patrol and, as a result, after meeting with Plaintiff and McDowell discussing her performance, Venzon extended her shadow phase an additional two weeks. SOF ¶ 71. Venzon was unaware of any recruit who had been extended in shadow, but Plaintiff's shadow phase was extended to give her the opportunity to fix issues she still had. SOF ¶ 72. In McDowell's end of phase evaluation, dated September 15, 2017, he evaluated Plaintiff as below standards/failing (B/F) in electronic communications, geography, and field performance and below standards/responding to training (B/R) in attitude. SOF ¶ 73. McDowell's end of phase evaluation gave multiple examples of

10

Plaintiff's failures in the performance areas and expressed how those failures put herself and others, including fellow officers', safety at risk. SOF ¶ 74. She read, understood, initialed, and signed the evaluation and, for the first time in her training, indicated that she wanted to discuss it with the training sergeant. SOF ¶ 75. Plaintiff agreed that the evaluation was McDowell's opinion of her performance and she did not know if there was anything factually inaccurate about McDowell's evaluation but she disagreed with it and felt it was unfair. SOF ¶¶ 76-77.

Thereafter, Venzon shadowed Plaintiff for a night so that he could get a firsthand assessment of her performance. SOF ¶ 79. He personally observed that her performance on most calls was poor and below standard. SOF ¶ 80. At that point, Venzon did not consider extending her training further because it was impractical and she had already received five extra weeks in training, three weeks in Phase II and two weeks in the shadow phase. SOF ¶¶ 81-82. Venzon believed five weeks was the most a recruit had been extended to have the opportunity to improve and meet PPD standards. SOF ¶¶ 83-84. He was also unaware of any recruit around 2017 who had similar below-standard performance issues as Plaintiff who was still retained and allowed to go into the solo phase and become a permanent PPD officer. SOF ¶¶ 85.

### Termination Decision and Subsequent Meeting

When termination for a recruit is being considered, a training log and outline are prepared with supporting training file folders recommending termination if the recruit failed to perform satisfactorily despite a reasonable opportunity to do so. SOF ¶¶ 86-87. These files are presented to officers who are higher in command. SOF ¶ 86. Venzon's responsibilities included putting conclusions in the outline and reflecting that all possible training had been exhausted to support whether to terminate the recruit. SOF ¶ 88. Here, Venzon prepared a training log and outline for Plaintiff because of performance issues indicating she might not make it through the program

11

and to show the training she obtained in the program and the subpar ratings she received during the program. SOF ¶ 90. He then spoke to Assistant Chief Snow about Plaintiff and anticipated separation and advised her that Plaintiff was failing to meet training standards. SOF ¶ 91.

Snow reviewed Plaintiff's file detailing her issues that arose repeatedly throughout the phases, which included daily observation reports; evaluations weekly, mid-phase, and end of phase; memoranda regarding remedial training; and the training log summarizing the main points of the phases. SOF ¶ 93. As a result of Plaintiff being unable to handle the workload and meet the Department's standard, Snow did not believe Plaintiff could safely work the streets and not put others at risk. SOF ¶ 94. Snow then recommended to Chief Mitchell that Plaintiff be terminated and provided him with the file containing all evaluation reports, the training log and outline, and remedial plans. SOF ¶ 95. The ultimate decision-maker as to whether to terminate or provide more training when a recruit did not meet performance standards was Chief Mitchell. SOF ¶ 96. Mitchell agreed with Snow after discussing it with her and independently reviewing Plaintiff's file. SOF ¶ 95. Mitchell decided the Department did everything they could possibly do that was reasonable to help Plaintiff succeed, but she still did not meet performance standards. SOF ¶ 98. Therefore, Mitchell made the ultimate decision to terminate Plaintiff. SOF ¶ 97.

After the Chief has made his decision to terminate, Venzon would be informed of the decision to terminate and be provided a meeting location and time to relay to the recruit. SOF ¶ 100. A recruit is notified in advance that a meeting will occur regarding employment status. SOF ¶ 99. On September 19, 2017, Plaintiff met with Venzon, Captain Green, and Assistant Chief Snow. SOF ¶ 103. Plaintiff received advanced notice of the meeting and her personnel file to review in advance of the meeting. SOF ¶ 101. Snow advised Plaintiff that she was not meeting the FTP's standards, and that the Department was out of options at that point and would

12

terminate her employment. SOF ¶ 105. Snow also noted that Plaintiff had been signing off on evaluations and would have been aware of the particulars of standards she was not meeting. SOF ¶ 106. Plaintiff was given an opportunity to speak during the meeting and did so. SOF ¶ 109. Plaintiff stated that she did not want to be terminated, so Snow informed her that she would be allowed to resign but it was up to Plaintiff if she wanted to be terminated or resign. SOF ¶ 107. Although the Department is ready to terminate at the meeting, there is a practice of allowing a failed recruit to resign rather than be fired. SOF ¶ 108. Plaintiff decided to submit a resignation letter then she rescinded her resignation the following day. SOF ¶¶ 110-11. Plaintiff was a probationary officer when she was separated from employment. SOF ¶ 142. Plaintiff testified that she asked a union representative to attend the termination meeting. SOF ¶ 137. She did not know why a union representative did not attend the meeting or if any of the Defendants barred a union representative from the termination meeting. SOF ¶¶ 138-39.

### *Plaintiff's Harassment Allegations and Potential Comparators*

The City of Peoria has an Employee Handbook which addresses discrimination and harassment. SOF ¶ 11. The Handbook encourages employees who feel they have been the victim of harassment of any kind to promptly report the discrimination to the department head, HR Manager, EEO Manager, or city attorney. SOF ¶ 12. Plaintiff attended a new employee orientation and acknowledged receipt and understanding of the City's Employee Handbook addressing the procedures for filing harassment and discrimination complaints. SOF ¶ 13. Plaintiff never reported or complained about any discrimination or harassment to any individual Defendant, the human resources department, the city manager, elected officials or the legal department. SOF ¶¶ 119-20 (Ex. A, Pearson Dep., p. 79-81, 86-88, 220-221; Ex. F, Venzon Dep., p. 43- 44, 70; Ex. H, Green Dep., p. 55; Ex. I., Snow Dep., p. 32).

In May 2017, during an EVOC training session at the airport, an instructor reported to Venzon that some recruits were not taking training seriously by not picking up cones. SOF ¶ 112. Then, Venzon dismissed everyone except Plaintiff and recruit Reggie Smith and berated them. *Id*. Venzon did not raise his voice or say anything inappropriate at the meeting. SOF ¶ 113. Plaintiff passed the EVOC course with no problems. SOF ¶ 114. When asked if there were other times that Venzon had berated her, Plaintiff recounted that at one of the shadow meetings Venzon stated that he did not owe her dad anything, and she felt singled out because of her relation to a family member, and that at another meeting she had to listen to a recording where an officer was shot and she felt belittled by it. SOF ¶ 115. However, Plaintiff did not recall if Venzon ever raised his voice or ever said anything inappropriate at any of the shadow meetings. SOF ¶ 116. Plaintiff could not recall any other incident where he berated her or treated her with hostility, abuse, or harassment. SOF ¶ 117. When Venzon rode with Plaintiff at the end of shadow phase, he never said or did anything inappropriate or unfair. SOF ¶ 118.

Adam Rossi, a male, was in the same recruit class as Plaintiff and attended the FTP at the same time. SOF ¶ 130. Rossi had similar below standard ratings during field training as Plaintiff, including officer safety issues pertaining to field performance standard. SOF ¶ 131. Like Plaintiff, Rossi was allowed to go into shadow phase despite these issues. SOF ¶ 132. He was notified at the end of shadow phase in September 2017 to attend a meeting with Sergeant Venzon, the Captain, and Assistant Chief, at which he was told the Department was separating his employment due to his below standard ratings during field training. SOF ¶ 132. Rossi chose to resign instead. Kathy Politis and Megan Rosenak were female, probationary recruits who were also in the same recruit class as Plaintiff, and attended the FTP at the same time. SOF ¶ 123. Unlike Plaintiff, Politis and Rosenak received satisfactory ratings in all performance standard

areas in Phase III and shadow phase then progressed into the solo phase and eventually out of probationary period. SOF ¶ 124. Austin Dixon, Joseph Harris, and Danny Marx, all males, were in the same recruit class as Plaintiff and attended the FTP at the same time. SOF ¶¶ 126, 128. Unlike Plaintiff, Dixon, Harris, and Marx received satisfactory ratings in all performance standard areas in Phase III and shadow phase and progressed into the solo phase and eventually out of the probationary period. SOF ¶¶ 127, 129.

### 2. Plaintiff's Additional Material Facts

As noted in Defendants' Reply, the following "undisputed facts" listed in Plaintiff's Response were revised but duplicative versions of Defendants' proposed undisputed facts: Plaintiff's SOF ¶¶ 1, 3, 6-8, 10-14, 17-43, 45-47, 54-55, 57-65, 67-77, 80-84, 86-87, 89-91, 93-95. Plaintiff also did not cite evidence in the record to support them but rather a page of Defendants' summary judgment brief. *See* Fed. R. Civ. P. 56(c)(1)(A). Therefore, the Court disregards them. Pltfs. SOF ¶¶ 9, 15-16, in Plaintiff's Response were not duplicative but they were not supported with evidentiary citations; therefore, they were likewise disregarded.

The following facts are additional to the undisputed facts provided by Defendants that were cited with evidentiary support from Plaintiff's deposition. Since leaving the Department, Plaintiff has maintained two law enforcement jobs: one at Creve Coeur and one at Woodford County. Pltfs. SOF ¶ 2.[3] Plaintiff's father retired as a lieutenant with Peoria County Sheriff's Office. Pltfs. SOF ¶ 48. Plaintiff had a meeting with Lieutenant Carrie Davis where the lieutenant told her that other officers hated her, and they hated her because she was smarter than them. Pltfs. SOF ¶ 53. During Phase I, FTO McBride told Plaintiff she was not the only recruit

---

[3] As indicated by Defendant, this fact is immaterial to the claims and defenses in this case. Whether Pearson has subsequently maintained a law enforcement position with other law enforcement agencies does not mean that she met legitimate job expectations of the PPD.

that has asked for help with executing the knowledge of the 100 block system in action. McBride told Plaintiff that other recruits also had difficulty understanding how to execute the block dividers. Pltfs. SOF ¶ 56. Plaintiff testified that, during the shadow phase, rather than discussing issues directly with her, FTO McDowell would passive aggressively have another officer discuss it with her and these discussions only included criticisms, not instructions. Pltfs. SOF ¶ 66.[4]

Plaintiff testified there were other incidents where Venzon berated her or treated her with hostility, abuse, or harassment but she could not recall any of them. Pltfs. SOF ¶ 49. She felt a sense of being intimidated every time she was in Venzon's office, that every meeting was worse than the previous one, and she remembered feeling like she could not actually speak freely to him. Pltfs. SOF ¶¶ 50-51.[5] Plaintiff also spoke to Officer Elizabeth Blair, Officer Bischoff, Recruit Buzzard, Recruit Rossi, and a female lieutenant whose name she could not recall at the moment, about her allegations of harassment, hostility, and abuse. Pltfs. SOF ¶ 52.[6]

Finally, the Parties dispute whether Plaintiff knew prior to the termination meeting that termination could be discussed. Rather, Plaintiff thought the meeting was about training. *See* Pltfs. SOF ¶¶ 78-79. However, as discussed in this Opinion, Plaintiff conceded she did not have a property interest in her employment, therefore, facts concerning the alleged due process

---

[4] Defendants mark this undisputed for purposes of this motion, but states it is immaterial because at shadow phase, training is supposed to be over, and the recruit is expected to handle a call from start to finish alone and without assistance. Doc. 46, at 12 (citing Defendants' SOF, ¶ 42-43).

[5] As indicated in the Court's Opinion and Defendants' brief, Pltfs. SOF ¶¶ 49-51 facts are vague and unconnected to any alleged gender discrimination or due process violations, therefore ultimately immaterial.

[6] Defendants do not dispute Pltfs. SOF ¶ 52 but assert it is immaterial because none of the people Plaintiff spoke to are named Defendants and she did not complain about any discrimination or harassment to any individual Defendant, the HR department, the city manager, elected officials, or the legal department despite the Employee Handbook's encouragement to do so. Doc. 46, at 12 (citing SOF ¶¶ 12, 119). The Court agrees with Defendant. First, Plaintiff does not use this fact to support her argument. Second, it is undisputed that Plaintiff never reported any harassment or hostility during her employment. SOF ¶¶ 119-20. Despite conceding SOF ¶¶ 119-20, Plaintiff notes she complained to officers. Yet, she does not claim they were the appropriate people to make such complaints to or that those people should have addressed her concerns but failed to do so. Thus, SOF ¶ 52 is immaterial.

16

violations in relation to the termination meeting are immaterial. Moreover, in their Reply,

Defendants provided evidence of text messages between Plaintiff and Officer Blair several days

before the meeting which clearly contradict Plaintiff's contention that she was unaware of the

subject of the meeting prior to it. *See* Doc. 46, at 15 (citing Ex. K, Blair Dep., p. 107-108, 113,

127-131; Exhibit P, Bates stamped PLTF 235). The remaining facts in Plaintiff's statement of

facts are immaterial and unnecessary to recite here. *See e.g.*, SOF ¶¶ 44, 85, 88, 92.

**LEGAL STANDARD**

Summary judgment is appropriate where the movant shows, through "materials in the

record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56. When presented with a motion for summary judgment, the Court must

construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to

decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770

(7th Cir. 2003). In resolving the motion, "[t]he court has one task and one task only: to decide,

based on the evidence of record, whether there is any material dispute of fact that requires a

trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth

specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250 (1986). If the evidence, however, is "merely colorable, or is not significantly

probative" or merely raises "some metaphysical doubt as to the material facts," summary

judgment may be granted. *Id.* at 249-50; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586 (1986). Thus, in order to overcome the undisputed facts set forth in a defendant's

17

motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must

point to affidavits, depositions, or other evidence of an admissible sort that a genuine dispute of

material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299,

309 (1996). "[I]f the non-movant does not come forward with evidence that would reasonably

permit the finder of fact to find in her favor on a material question, then the court must enter

summary judgment." *Waldridge*, 24 F.3d at 920.

DISCUSSION

Defendants have moved for summary judgment on all remaining claims: the Section 1983

equal protection claim (Count I) against Defendants Venzon, Snow, and Green; the procedural

due process claims (Counts II and VII) against Defendants Venzon, Snow, Green, and Mitchell in

their individual capacities; and the state law indemnification claim (Count VI). Although Plaintiff

has not moved for summary judgment, she agrees there are no disputed facts. Rather, Plaintiff

argues (1) the undisputed facts demonstrate she was terminated on account of her gender in

violation of the equal protection clause; (2) she did not receive all procedural protections that

were due under the U.S. Constitution; (3) the individual Defendants are not entitled to qualified

immunity; and (4) The City of Peoria must indemnify the individual Defendants for the

violations Plaintiff alleges. The Court will address each issue in the same order as the Parties,

beginning with the gender discrimination claim. Like the Parties, the bulk of the Court's analysis

is devoted to this claim.

## I.       Equal Protection – Gender Discrimination (Count I)

After describing case holdings related to *McDonnell-Douglas Corp. v. Green*, 411 U.S.

792 (1973) and *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), Defendants offer

three arguments as to why they are entitled to summary judgment on this claim. Doc. 40, at 22-

18

24. First, Plaintiff has not established a prima facie case of discrimination in applying the first

four prongs of the *McDonnell Douglas* burden-shifting framework. *Id.* at 24-32. Second, even if

Plaintiff has met her burden, Defendants claim they have presented legitimate, non-

discriminatory reasons for her termination, which Plaintiff has failed to rebut with evidence of

pretext. *Id.* at 32-33. Finally, the undisputed facts do not establish a hostile work environment

claim. *Id.* at 33-35. Plaintiff seems to criticize the *McDonnell Douglas* framework then proceeds

to follow exactly that in her Response. Doc. 33, at 13-16. The Court also notes Plaintiff does not

address the Defendants' second and third arguments. Therefore, she that concedes she has not

established a hostile work environment claim as part of her gender discrimination claim and if

she has not met the four prongs of *McDonnell Douglas*, then she has no evidence to offer for the

burden-shifting portion of the framework in steps five and six. *See C & N Corp. v. Kane*, 756

F.3d 1024, 1026 (7th Cir. 2014) (holding that a nonmovant's failure to make an argument in

response to a summary judgment motion amounted to waiver of that argument); *Bonte v. U.S.

Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (noting the silence resulting from the non-

movant's failure to file a response brief was deafening and resulted in waiver).

    In considering the evidence as a whole, the singular question that matters in a

discrimination case is: "Whether the evidence would permit a reasonable factfinder to conclude

that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or

other adverse employment action." *Ortiz*, 834 F.3d at 765. *See McDaniel v. Progress Rail

Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019) (holding the plaintiff's discrimination claim

failed under the *Ortiz* holistic approach and *McDonnell Douglas* framework). It is well-settled

that a plaintiff may still utilize the *McDonnell Douglas* "burden-shifting" framework to meet the

holistic standard described in *Ortiz*. *Id.*; *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d

887, 894 (7th Cir. 2018). The Parties have chosen to present their cases using this framework. The Court will do the same.

The *McDonnell Douglas* burden-shifting framework for employment discrimination claims requires Plaintiff to show: (1) she is a member of a protected class; (2) she was meeting the defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021). A court need not address the other elements of the framework, including legitimate business expectations, where the plaintiff failed to satisfy the fourth element by not providing sufficient evidence regarding a similarly situated individual. *McDaniel*, 940 F.3d at 368.

If a plaintiff has established a prima facie case under *McDonnell Douglas*, then the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Carson v. Lake County, Indiana*, 865 F.3d 526, 533 (7th Cir. 2017). If such reason is given, then the burden shifts back to the plaintiff to demonstrate that the employer's explanation is "pretextual." *Id.* To show pretext, a plaintiff must present evidence suggesting the employer's "proffered reason is a lie" by identifying "weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's asserted "reasons that a reasonable person could find it unworthy of credence." *Marnocha*, 986 F.3d at 721 (quoting *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). However, as indicated above, Plaintiff failed to respond to Defendants' argument regarding steps five and six and therefore conceded she has no evidence to offer to support pretext or rebut Defendants' assertions on these issues. To the extent some arguments for pretext could overlap with arguments raised where Plaintiff addresses the

employer's legitimate expectations in prong two, the Court has addressed them below.

Regardless, as discussed below, Plaintiff failed to meet her burden to establish each element of

her prima facie case under the *McDonnell Douglas* framework.

Defendants do not contest that Plaintiff is a member of a protected class as a female or

that she was subjected to an adverse employment action by virtue of her termination or forced

resignation. *Id*. However, Defendants argue she has not met the second and fourth prongs of the

*McDonnell Douglas* framework: that she met legitimate employment expectations and she was

subjected to an adverse employment action as to claimed acts of harassment, or that similarly

situated employees of the opposite sex were treated more favorably. *Id*. Plaintiff claims she met

the Department's expectations because she graduated at the top of her police academy class

while simultaneously receiving an academic degree; since leaving the Peoria Department, she

has held two law enforcement positions; and she showed signs of improvement throughout her

training despite not being properly trained. Doc. 43, at 14-15 (citing Pltfs. SOF ¶¶ 29, 53-63, 65).

Plaintiff then states she was in route to satisfy the Department's expectations by the end of her

year period,[7] but at some point, the Department's expectations became illegitimate and

unachievable due to personal animus. *Id.* at 15 (citing Pltfs. SOF ¶¶ 46-51, 53).

Plaintiff has not shown that she met the Department's legitimate expectations. At the

outset, the expectations of another law enforcement office wholly fail to address the

"Defendant's expectations." The second prong does not ask for the expectations of police

---

[7] To be clear, Plaintiff does not claim she had until the expected end date of the probationary period of December 15, 2017 to meet the Department expectations despite being terminated or "forced" to resign around September 19, 2017. In fact, the Parties do not discuss the time period between the completion of the five phases and the technical end to the probationary period at all. Plaintiff concedes the five phases take at least 16 weeks, but can take longer, and Plaintiff had received five extra weeks of training for the portion of at least 14 weeks of expected training (four weeks for each of the first three phases and two weeks of shadows in phase four). SOF ¶¶ 22, 82. She also does not dispute a recruit could be fired at any time during the probationary period. SOF ¶¶ 10, 145.

21

departments generally, it asks for those of the named Defendant. Moreover, the Court "must examine her performance at the time of the challenged adverse actions," not at some later date with a different employer. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007). Therefore, Plaintiff's reference to her latter employment is not relevant.

Moving on to the undisputed facts in this case, a recruit must complete the 12-week police training at the police academy and the FTP, which can be completed in 16 weeks, to become a sworn officer, as well as the year and a day probationary period. SOF ¶¶ 7, 44-45. Plaintiff only completed one of those components, the police academy, therefore she could not have met the employer's legitimate expectations. Regarding the FTP, Plaintiff agrees there were 11 areas of competency she had to pass in order to be sworn in as police officer and every recruit who had successfully completed the program and was hired had satisfactory performance standards in all of these areas by the end of the shadow phase. SOF ¶¶ 42, 45. Plaintiff does not contest the legitimacy or reasonableness of any of these 11 categories of expectations. As highlighted by Defendants, Plaintiff does not dispute that she knew throughout the FTP that she consistently performed below the Department's performance standards in multiple areas, particularly geography and field performance, based on evaluations from her field training officers. *See* SOF, ¶ 55-75. She did not dispute the evaluations she received throughout the process as she read, understood, initialed, and signed each evaluation. SOF, ¶¶ 56, 58-59, 62, 66-67, 75-77. She never wished to discuss her evaluations with the training sergeant until the end of her extended shadow phase. *Id.*, ¶ 42, 75. Thereafter, Venzon even shadowed her and saw the same deficiencies that the FTOs had documented throughout her field training process.

Even in her brief, Plaintiff concedes she struggled with training early-on but states "she showed signs of improvement throughout her training." Yet, she does not claim she was meeting

the training expectations or cite to evidence in support. To the extent "improvement" refers to her receiving the grading that she was "below standards but responding to training" in the earlier phases, such assertion fails to account for the shadow phase where training is supposed to be over and the recruit either meets or does not meet standards and the FTO serves solely as an evaluator of the recruit's performance. *See* SOF ¶ 19. 43. In the end, Plaintiff ultimately received below standards/failing (B/F) in electronic communications, geography and field performance and below standards/responding to training (B/R) in attitude. SOF ¶ 73. The areas of geography and field performance were the two areas Plaintiff repeated struggled with throughout the entire training as noted by various officers who had pointed them out along the way. *See generally* SOF ¶ 55-75, 79. Plaintiff does not contest the importance of these areas or that she had to pass all 11 categories to proceed to the solo phase. *See* SOF ¶¶ 32-40, 45.

The Court agrees with Defendants that Plaintiff's concessions are fatal to her claims as she has essentially conceded she did not meet the Department's expectations. Doc. 40, at 25 (citing *Buntin v. City of Indianapolis*, 500 Fed. Appx. 524, 526 (7th Cir. 2013); *Squibb*, 497 F.3d at 788). In *Buntin*, 500 Fed. Appx. at 526, the Seventh Circuit held a plaintiff failed to show she met her employer's legitimate expectations based on her admission that her training officers, aside from one, graded her fairly, gave her failing scores in several critical areas, and that those areas were legitimate job expectations of a probationary police officer. In *Squibb*, 497 F.3d at 788, the Seventh Circuit held, the plaintiff failed to provide evidence that she reasonably performed to the employer's expectations during the relevant time period where she had missed significant amounts of work and had received poor evaluations for a lack of attention to detail. Similarly here, at the time she was terminated or "forced to resign," Plaintiff had a record of deficiencies throughout her training articulated by multiple FTOs, she did not challenge her

23

performance reviews, and she was unable to receive satisfactory ratings in all of the 11 crucial areas at the completion of her shadow phase despite five weeks of additional training time.

In her Response, Plaintiff then diverts attention away from the Department's expectations to make a cursory remark that the FTO grading her during the shadow phase provided only indirect criticisms and did not provide feedback.[8] But this fails to explain how she was not properly led or trained by the FTOs assigned to her throughout the process and she does not cite evidence to show such conduct was improper by the Department's standards. Assuming there is a difference between "criticism" and "feedback" beyond one's subjective perception and this failure amounted to improper training, Plaintiff does not claim that she was singled out for these training failures due to her gender, while other male recruits received proper training. She also does not claim some sort of collusion among FTOs or between FTOs and Venzon to undermine her training.

Following her brief discussion regarding training and its alleged inadequacies, Plaintiff asserts personal animus was also shown on multiple occasions by Venzon. Doc. 43, at 15 (citing Pltfs. SOF ¶¶ 46-51). These "multiple occasions" include two specific instances and two groups of vague remarks from Plaintiff's deposition regarding Venzon. The Court will discuss them in turn. First, Venzon was allegedly hostile because he took her and another recruit, Reggie Smith, aside and berated them after an officer complained that they were not taking training seriously because they would not move cones, as instructed. SOF ¶ 112 (Pltfs. SOF ¶ 46). Notably, such incident took place in May 2017 during EVOC training which Plaintiff concedes she passed with no issues and Venzon did not raise his voice or say anything inappropriate at the EVOC meeting.

_____

[8] *See* Doc. 43, at 15 (citing Pltfs. SOF ¶ 65). However, Plaintiff's SOF ¶ 65 does support her assertion here and as indicated earlier, the Court disregarded SOF ¶ 65 as duplicative of Defendants' undisputed SOF.

SOF ¶¶ 113-14. More importantly, Plaintiff agrees she was not the only recruit or only gender singled out for this arguably legitimate reprimand, which did not negatively impact Plaintiff based on the record. Second, Venzon made a remark during one of the shadow meetings that he did not owe her father, a retired lieutenant, anything. As Defendants emphasize, this case is about gender discrimination, not familial ties, which is not a protected status. Doc. 46, at 19. This isolated comment also does not infer any gender animus and it is hardly a personally negative comment. Rather, the more reasonable inference is that Venzon was making clear he was not required to pass Plaintiff through the shadow phase simply because her father retired as a lieutenant from the Department. Third, Plaintiff cites her testimony where she states she felt a sense of being intimidated every time she was in Venzon's office, every meeting was worse than the previous one, and she could not speak freely to him. Yet, these vague feelings at meetings are divorced from any gender-specific discrimination allegations and could very well be attributed to the nervousness many employees feel in talking to one's boss. Finally, Plaintiff testified there were other incidents where Venzon berated her or treated her with hostility, abuse, or harassment but she could not recall any of them. Pltfs. SOF ¶ 49. "[C]onclusory statements not grounded in specific facts are not enough to stave off summary judgment." *King v. Ford Motor Company*, 872 F.3d 833, 840 (7th Cir. 2017). Therefore, these statements fail to support any notion of gender discrimination.

In her final attempt to disprove the Department's legitimate expectations, Plaintiff remarks she was told by a Lieutenant that the others, including FTOs, did not like her because she was smarter than them. Doc. 43, at 15 (citing Pltfs. SOF ¶ 53). However, her cited deposition testimony does not specifically identify the individuals that do not like her because she is "smart." Thus, Plaintiff does not provide evidence that FTOs or higher-ranked individuals like

Venzon, Snow, and Mitchell, who are the named Defendants, were included in this group. Even so, as Defendants point out, "intelligence" is not a protected class. Doc. 46, at 19. Thus, Plaintiff's assertion that at some point, her employer's expectations became illegitimate and unachievable due to personal animus is mere speculation without evidentiary support and insufficient to withstand summary judgment. *Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011).

Based on the Court's above discussion, it is clear Plaintiff has not shown she met her employer's legitimate expectations or that those expectations were illegitimate. Therefore, the Court need not address the similarly situated inquiry in prong four of the *McDonnell Douglas* analysis. *See McDaniel*, 940 F.3d at 368. However, in the interest of the viewing the evidence as a whole, the Court will address Plaintiff's argument regarding a comparator. Under the framework, a plaintiff must identify a similarly situated employee who was not a member of her protected class but was treated more favorably. *Marnocha*, 986 F.3d at 718; *Skiba*, 884 F.3d at 723. In determining whether someone is comparable, courts consider all relevant factors, including "whether the employee (1) held the same job description; (2) was subject to the same standards; (3) was subordinate to the same supervisor; and (4) had comparable experience, education, and other qualifications." *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009). This inquiry is intended to "eliminate other possible explanatory variables, such as differing roles, *performance histories*, or decision-making personnel, which helps isolate the critical independent variable – discriminatory animus." *Marnocha*, 986 F.3d at 719 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (emphasis added)).

On this point, Plaintiff fails to identify any male who was similarly situated to her but treated more favorably. This failure alone is fatal. *See McDaniel*, 940 F.3d at 369 (holding a

plaintiff's prima facie case failed where she failed to identify any similarly situated employees to allow a factfinder to conduct a "meaningful comparison") (citing *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007)); *see also Skiba*, 884 F.3d at 723. Instead, Plaintiff oddly states, the "fourth element can be satisfied by the same narrative facts from the second element that demonstrate the position Plaintiff was subjected to[.]" Doc. 43, at 16. Plaintiff claims she started her probationary period with a target on her back due to her gender and familial ties, which stayed there consistently throughout each phase and she was the only one subjected to the berating and office visits with Venzon, where she felt on edge the entire time. *Id*. Such assertions bely the evidence in the record: the first mention of Plaintiff's father by Venzon occurred sometime during the shadow phase (SOF ¶ 115), which was well beyond the "start" of Plaintiff's probation period in December 2016; Plaintiff never asserted she was discriminated against based on gender in December 2016, rather, it allegedly occurred "at some point" during her training period when her employer's expectations became "illegitimate" (Doc. 43, at 15); and Plaintiff offers only once instance of berating wherein at least one other recruit was also "berated" and she does not claim the recruit was also female (SOF ¶ 112; Pltfs. SOF ¶ 46). Beyond these record flaws, it is worth repeating familial ties are not a protected class and Plaintiff fails to connect a reference to her father to any animus against females. She also does not claim that the FTOs grading her throughout the training process were the ones singling her out based on gender, rather she only discusses Venzon's remarks and her vague feelings about him.

Furthermore, as Defendants provide in their Motion and Reply, it is undisputed that the other probationary officer in her training class who received below standards ratings was a male, proceeded to the shadow phase, and had a termination meeting for failing to meet the same objective standards applied to Plaintiff, but he chose to resign instead. SOF ¶¶ 130-133. At the

27

same time, there were also male and female recruits in the same class, who unlike Plaintiff, earned satisfactory ratings in all performance standard areas in Phase III and the shadow phase and progressed into the solo phase. SOF ¶¶ 123-24. For these reasons, Plaintiff has clearly not met the fourth prong where she failed to identify a potential comparator and her arguments in support are not supported by the record and do not infer gender discrimination.

In viewing the evidence as a whole, including Plaintiff's arguments beyond the *McDonnell Douglas* framework, there is no evidence to suggest Plaintiff was terminated from her probationary employment as a result of gender discrimination. *Ortiz*, 834 F.3d at 765. Therefore, Plaintiff's position is based on mere speculation, which is not enough to get a case to a jury. *Overly*, 662 F.3d at 864 (citing *Davis v. Carter,* 452 F.3d 686, 697 (7th Cir. 2006) (explaining that "when the evidence provides for only speculation or guessing, summary judgment is appropriate")). No reasonable juror could find that Plaintiff's gender caused any of the alleged adverse employment actions. Summary judgment is granted as to Plaintiff's gender discrimination claim in Count I.

## II.     Procedural Due Process Claims (Counts II and Count VII)

Recall, Plaintiff's second argument in her Response is that "she did not receive all procedural protections that were due under the U.S. Constitution." Doc. 43, at 16-17. In their Motion, Defendants argue they are entitled to summary judgment because Plaintiff had no property interest in her probationary employment and even if she did, she received all the procedural protections due to her. Doc. 40, at 35-40. Plaintiff's Response to withstand summary judgment is brief. She recites the definition of "procedural due process" and its requirements, then argues her due process rights were violated because she did not receive proper notice of the *subject* of the termination; rather she thought it was to discuss training, and therefore she did not

28

receive the protection of being about to "prepare" for the meeting. Doc. 43, at 16-17 (citing Pltfs. SOF ¶ 78-79). She also argues she was not given the opportunity to be represented by a union representative during this meeting despite asking a representative to attend the meeting and she was not given a "meaningful post-deprivation remedy." *Id.* (citing Pltfs. SOF ¶¶ 85, 92-95).

To state a due process claim, a plaintiff must first establish she had a constitutionally protected property interest in her employment. *Rujawitz v. Martin*, 561 F.3d 685, 688 (7th Cir. 2009); *Covell v. Menkis*, 595 F.3d 673, 675 (7th Cir. 2010). "Under Illinois law, a person has a property interest in his job only where he has a legitimate expectation of continued employment based on a legitimate claim of entitlement." *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007). Here, Plaintiff would need to show a legitimate expectation of continued employment by pointing to an Illinois law, an ordinance, a contract, or some understanding that limited the Department's ability to discharge her. *Redd v. Nolan*, 663 F.3d 287, 296 (7th Cir. 2011). While Illinois generally does not recognize a property interest in continued employment for probationary public employees, a municipality may provide greater protection to these employees through enacting rules and regulations. *Id*. Such a rule or regulation can only create a property interest if it is a "clear policy statement" that overcomes the clear statutory language allowing probationary employees to be fired without cause. *Id.* at 296-97.

When the Parties briefed this issue at the Rule 12(b)(6) stage, Plaintiff claimed probationary officers in Peoria were given greater due process protection than provided by state law because Field Training General Order 300.11 created an entitlement to a propriety interest, which was "strengthened by other agreements, policies, and aspects of the recruit program." Doc. 25, at 14-15 (citing Doc. 19, at 8). The Court denied Defendants' motion to dismiss Plaintiff's due process claim because Plaintiff did assert Defendants were limited in their ability

to discharge recruits. However, the Court emphasized that "[i]t is questionable whether FTGO 300.11 or any other provision establishes Pearson had a protected property interest in her employment because she does not allege recruits could be terminated only for cause." *Id*. Therefore, the Court allowed discovery to proceed with the belief that it would further resolve the issue. Discovery has concluded and the Court is in better position to opine.

Nothing appears to have changed since the Court's 12(b)(6) ruling except the standard at summary judgment is different where the Court does not accept Plaintiff's bare allegations as true. Rather, it "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). There is no disputed fact that needs resolved to conclude Plaintiff did not have a property interest in her employment. It is undisputed that Plaintiff was a probationary employee when she terminated and General Order 300.11, which Plaintiff relied on in her Complaint for her procedural due process claims, does not state that a recruit or probationary officer could only be fired "for cause." SOF ¶¶ 142, 144. Recruits are at-will employees during the probationary period, and the Chief of Police does not need cause to separate a probationary officer from employment. SOF ¶ 141. Plaintiff could not point to a statute, regulation, rule, general order, or contract that stated a probationary officer could only be fired for cause. SOF ¶ 136. In her Response, Plaintiff conceded this issue of a property interest entirely by failing to demonstrate she has a constitutionally protected property interest, which is the first requirement for a due process claim. *Rujawitz*, 561 F.3d at 688 (citing *Moss*, 473 F.3d at 700; *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996)). She also failed to respond to Defendants' argument on this requirement at all, thus waiving her argument. *See C & N Corp.*, 756 F.3d at 1026. Based on the undisputed facts, and as laid out in Defendants'

30

Motion (Doc. 40, at 35-39), Plaintiff has failed to provide evidence of any Illinois law, ordinance, contract, or some understanding that limited the Department's ability to discharge her or a "clear policy statement" that created a property interest in her probationary employment therefore her due process claims fail. *See Redd*, 663 F.3d at 296-97.

To the extent there could be any remaining questions surrounding the union representative's role regarding termination meetings for recruits, Plaintiff admits she did not know why the union representative did not attend the meeting and specifically testified that she did not know if any of Defendants barred it. This case is at summary judgment, well after discovery has ended wherein Plaintiff had the opportunity to take discovery on this issue. At this point, her allegations regarding the union representative's failure to attend the meeting and whether she was entitled to such representation are mere speculation. *See Overly*, 662 F.3d at 864; *Johnson*, 325 F.3d at 901. Thus, summary judgment is granted on Count II as Plaintiff failed to show she had a property interest and there are no disputed facts that require a trial. *See also* Plaintiff Response, Doc. 43, which advocates throughout that there are no disputed facts.

Count VII appears to be a Section 1983 retaliation claim "by way of a due process violation." It seems Plaintiff has abandoned Count VII. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 718, 721 (7th Cir. 2011). She does not discuss how she was retaliated against in her statement of facts section or argument section of her brief even though Defendants seek summary judgment on all claims. She also fails to respond to any of Defendants' arguments asking for summary judgment on this claim, thus waiving her argument. *See C & N Corp.*, 756 F.3d at 1026. Even so, Plaintiff has conceded she had no property interest, which is a prerequisite to a due process claim. *See Rujawitz*, 561 F.3d at 688. Thus, the Court concludes summary judgment is appropriate on Count VII.

31

### III.      Remaining Arguments: Indemnification (Count VI) and Qualified Immunity

Count VI is a state law indemnification claim against the City or Peoria. Plaintiff concedes he has not made any substantive allegations against the City of Peoria, rather it is only being used for indemnification purposes. Doc. 43, at 18. "A local public entity is not liable where an employee is not liable." *Vill. of Bloomingdale v. CDG Enters., Inc.*, 752 N.E.2d 1090, 1100 (Ill. 2001) (citing 745 ILCS 10/2–109). Thus, because Plaintiff no longer has any viable claims against the individual Defendants, summary judgment is appropriate on Count VI for indemnification. Additionally, because summary judgment is appropriate on all claims, the court need not address the Parties' arguments regarding qualified immunity.

### CONCLUSION

For the reasons set forth above, Defendants' Motion (Doc. 50) for Summary Judgment is GRANTED. The Clerk is directed to close the case.

Signed on this 21st day of January, 2022.

s/James E. Shadid
James E. Shadid
United States District Judge